IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL ACTION NO. 16-144 |
| vs. | : |
| | : CIVIL ACTION NOS. 20-5752, 21-1355 |
| DAVID ROBINSON | : |

**M E M O R A N D U M**

**Chief Judge Juan R. Sanchez**                                                              **October 15, 2021**

      David Robinson has filed two pro se Motions under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence, with multiple pro se supplements.[1] The Government has responded and the motions are ripe for disposition. For the following reasons, they shall be denied.

**FACTUAL BACKGROUND**[2]

      On April 7, 2016, Robinson was charged in a grand jury indictment in this Court with two counts of bank robbery in violation of 18 U.S.C. § 2113(a). These charges arose out of two robberies which occurred on March 19 and March 21, 2016 at two PNC Bank branches in close proximity to one another on North Broad Street in Philadelphia. In both robberies, the perpetrator made no attempt to conceal his appearance and he was seen clearly by bank personnel, other customers and the security cameras inside the lobbies of both banks. In each robbery, the

---

[1] Notwithstanding the general limitation against filing a second or successive petition under §2255(h), Robinson's claims in both of his pro se petitions and so-called "supplements" appear to mirror one another. Hence, the Court considers them as having been filed in a single petition.

[2] Although not a verbatim recitation, the facts here are taken from the Third Circuit's decision affirming the denial of Robinson's motion to suppress physical evidence and witness identifications by then-Chief Judge Stengel. *See*, *United States v. Robinson*, No. 19-3042, 821 F. App'x. 141 (3d Cir. Aug. 12, 2020).

1

perpetrator carried a curved, wooden walking cane and wore the same clothing: a gray sweatshirt and sweatpants, gray knit cap, gray and black two-tone gloves and navy-blue New Balance sneakers. On both occasions, the perpetrator submitted a demand note to the tellers demanding that they give him all of their cash. The victim teller in the first robbery handed over some $3,020 in cash; the second victim relinquished $1,190.

Following the robberies, the FBI circulated photographs along with a detailed physical description of the perpetrator to local law enforcement. The suspect was said to be:

> "Age, late 30s to early 40's, black male with a large build, approximately 350 pounds, five-ten to six-feet in height. His facial hair was a beard and his closing (sic) was a gray knit hat, gray shirt, gray sweatpants, gloves and a black cane…. The notices also described the suspect as armed and dangerous."

*United States v. Robinson*, 821 F. App'x. at 142.

On the evening after the second robbery, U.S. Probation Officer Akaga Campbell contacted the FBI after seeing and recognizing Robinson from the circulated photographs. Probation Officer Campbell had been Robinson's supervising probation officer for the past several months and she recognized and identified him as the individual depicted in the photos and described in the notices. Robinson had been scheduled to meet with Officer Campbell earlier that day but had failed to report. She informed the FBI agents that Robinson struggled with drug addiction and had failed to report for treatment and other scheduled meetings in the days leading up to the robberies. His failure to report constituted a violation of the conditions of his supervised release, and the U.S. Probation Office therefore sought and secured an arrest warrant for Robinson.

The following morning, on March 22, 2016, Southeastern Pennsylvania Transportation Authority (SEPTA) Police Officer Jeffrey McKee saw Robinson while on patrol in the area near the banks that had been robbed in North Philadelphia. Officer McKee had begun his shift that morning by reviewing the "Be On the Lookout" notices issued by the FBI regarding the robberies

which included both the description and the photographs of the suspected perpetrator. When Officer McKee saw Robinson, Robinson was wearing the exact same clothing depicted in the photographs and described in the notices and was carrying the same black, curved wooden walking cane. Officer McKee radioed to report he saw the robbery suspect, requested backup, exited his patrol car, and approached Robinson. As he did so, the officer directed Robinson to put his hands in the air, but Robinson "kept reaching around in his waistband," prompting Officer McKee to draw his service weapon while commanding Robinson to face a nearby wall with his hands raised. Two Philadelphia police officers arrived and placed Robinson in custody. Robinson was handcuffed and patted down for weapons and the officers ran a warrant search, although it is unclear whether they learned of any outstanding warrants for Robinson's arrest at that time.

While Robinson was being detained, another SEPTA police officer went to the bank which had been robbed the preceding day and returned to the scene with two bank employees who witnessed the robbery. Both employees immediately and firmly identified Robinson as the robber. Robinson was transported to the FBI's Philadelphia offices where he was processed and placed into the custody of the United States Marshals Service.

Following the denial of his motions to suppress evidence of his clothing and cane and his out-of-court identifications by the robbery witnesses, and after several continuances and the appointment of five different attorneys to represent him, Robinson elected to plead guilty to both counts of the indictment on May 10, 2019. He was sentenced on August 28, 2019 to 151 months of imprisonment to be followed by three years of supervised release and ordered to pay $4,210 in restitution and a $200 special assessment. Under the plea agreement, Robinson could file a direct appeal of his sentence if the Government appealed from the sentence and could file a direct appeal or petition for collateral review only to raise a claim (1) that the sentence imposed exceeded the

statutory maximum for any count or the sentencing judge imposed an "upward departure" from the Sentencing Guidelines or an "upward variance" above the final sentencing guideline range determined by the court; (2) an attorney who represented him during the course of his case provided constitutionally ineffective assistance; or (3) the district court's decision on the motion to suppress witness identifications and physical evidence was erroneous. (Guilty Plea Agreement, ¶ 12, ECF No. 100). Robinson's court-appointed counsel filed a timely Notice of Appeal on the suppression issue, and Robinson thereafter filed several pro se "motions for reconsideration" in the district court seeking to challenge, *inter alia,* several of the representations made in the pre-sentence investigation report as well as the Court's determination that he was a career offender and its application of a career offender enhancement under the federal sentencing guidelines. The motions for reconsideration were denied by this Court on July 28, 2020 and the Third Circuit affirmed the denial of the motion to suppress on August 12, 2020. Robinson then filed this timely motion under 28 U.S.C. § 2255 on November 16, 2020.

**LEGAL STANDARDS**

As noted, Robinson invokes 28 U.S.C. § 2255 to obtain relief from his conviction and sentence. Section 2255 authorizes the filing of petitions seeking habeas corpus relief by prisoners "in custody under sentence of a court established by Act of Congress," 28 U.S.C. §2255(a), and authorizes the sentencing court to grant appropriate relief upon finding "that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack," *id.* §2255(b). [3]

---

[3] And, under subsection (e), a necessary pre-condition to consideration of a § 2255 motion is exhaustion. As with 28 U.S.C. § 2254, its statutory analogue to prisoners in custody pursuant to state court judgments, § 2255 requires "a federal prisoner to exhaust his remedies in the courts of

There remains a basic distinction between direct review and collateral review under §2255. *United States v. Addonizio*, 442 U.S. 178, 184 (1979). "It is well-established that 'to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.'" *United States v. Cleary*, 46 F.3d 307, 310 (3d Cir. 1995)(quoting *United States v. Frady*, 456 U.S. 152, 165, 102 S. Ct. 1584, 71 L. Ed.2d 816 (1982)). "[A]n error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* "The alleged error must raise a fundamental defect which inherently results in a complete miscarriage of justice." *Id.,* at 185; *United States v. Essig*, 10 F.3d 968, 977, n. 25 (3d Cir. 1993). "Moreover, 'in considering a motion to vacate a defendant's sentence, the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record.'" *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008)(quoting *Gov't. of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)).

While district courts generally have discretion to conduct an evidentiary hearing on § 2255 claims, exercise of that discretion is cabined by subsection (b) of the statute itself. An evidentiary hearing is dictated "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also, United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005). As the Third Circuit recently clarified, "[t]his involves a two-pronged inquiry." *United States v. Arrington,* No. 19-2973, 2021 U.S. Dist. LEXIS 27130, at *6 (3d Cir. Sept. 9, 2021). "First, the district court 'must consider as true all appellant's nonfrivolous factual claims.'" *Id.* (quoting *United States v. Dawson*, 857 F.2d 923, 927 (3d Cir. 1988)).

---

the District and Circuit in which he was convicted and sentenced, and to apply to the Supreme Court, on certiorari from a denial of such remedies, before seeking release on habeas corpus." *United States v. Phillips*, No. 07-cr-549-1, 2021 U.S. Dist. LEXIS 106947, *9 (E.D. PA. June 8, 2021)(quoting *Crismond v. Blackwell*, 333 F.2d 374, 377 (3d Cir. 1964) and *Kikumura v. United States*, 978 F. Supp. 563, 573-574 (D.N.J. 1997)).

"Second, it 'must determine whether, on the existing record, those claims that are nonfrivolous conclusively fail to show'" any entitlement to relief. *Id.* Bald assertions and conclusory allegations do not provide sufficient grounds to require an evidentiary hearing on a § 2255 motion. *United States v. Donahue*, No. 18-1907, 792 F. App'x. 165, 168 (Nov. 1, 2019); *Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). Thus, where the motion, files and records conclusively show that the movant is not entitled to relief, courts maintain the discretion to summarily dismiss a § 2255 motion. *United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994).

**DISCUSSION**

Although his filings are somewhat difficult to discern, the Court surmises that Robinson is advancing the following arguments[4] in support of his motion to vacate his 151-month sentence:

1. He did not waive his right to proceed to trial pro se but rather "acquiesced" with the Court because it refused his request to have a sixth attorney appointed to represent him;

2. There were "ineffective assistance of counsel issues" with Federal Defender Stuart Patchen, Esquire and later, with Paul Hetznecker, Esquire who appointed to represent him after Attorney Patchen and two other interim attorneys withdrew.

3. The FBI violated his Fourth Amendment rights under the so-called "stalking horse doctrine" by using his violation of supervised release "as a pawn to assist them in The Bank Robbery charges."

4. He was improperly charged with bank robbery because the demand notes were non-threatening and were not intimidating and because none of the witnesses felt in danger or threatened.

5. He should not have been sentenced as a career offender because his prior possession with intent to deliver conviction should not have served as a predicate offense given that, had "new laws for sentences under crack cocaine" existed at the time, he would have received a lighter sentence for that offense.

---

[4] Because Robinson is pro se, the Court has "a special obligation" to construe his filings liberally. *Haines v. Kerner,* 404 U.S. 519, 520-521 (1972); *Ricks v. Shover*, 891 F.3d 468, 471 (3d Cir. 2018). This principle applies with equal force to habeas corpus petitions which are prepared by a prisoner without legal assistance. *United States v. Santarelli*, 929 F.3d 95, 103 (3d Cir. 2019)("A habeas corpus petition prepared by a prisoner without legal assistance may not be skillfully drawn and should thus be read generously.")

Inasmuch as none of these arguments has any merit and the record in this matter conclusively demonstrates that Robinson is not entitled to any relief, the Court exercises its discretion to decline to hold an evidentiary hearing. For one, with the exception of his ineffective assistance of counsel claim[5], all of Robinson's remaining arguments have been procedurally defaulted by virtue of his failure to raise them on direct appeal.[6]

Robinson's first claim is also easily dispatched on the basis of the terms of his plea agreement and the extensive colloquies conducted at the Final Pretrial Conference on May 6, 2019 and the Change of Plea Hearing on May 10, 2019.

It is axiomatic that a guilty plea is constitutionally valid only to the extent it is "voluntary" and "intelligent." *Bousley*, 523 U.S. at 618. A plea does not qualify as intelligent unless a criminal defendant first receives "real notice of the true nature of the charges against him," and it is neither knowing nor intelligent unless the defendant has "sufficient awareness of the relevant circumstances and likely consequences." *Id.,* (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)) ; *Brady v. United States*, 397 U.S. 742, 748 (1970); *Aldea v. Oberlander,* Civ. A. No. 20-

---

[5] "An ineffective assistance of counsel claim may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 523 U.S. 500, 504 (2003).

[6] "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate cause and actual prejudice … or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998). "[T]he cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim[,]… [and] [o]nce the petitioner has established cause, he must show "'actual prejudice'" resulting from the errors of which he complains.'" *McCleskey v. Zant*, 499 U.S. 467, 493-494 (1991)(quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986), and *United States v. Frady*, 456 U.S. 152, 168 (1982)); *Parkin v. United States*, 565 F. App'x. 149, 151 (3d Cir. May 5, 2014). In this case, Robinson does not even argue that cause exists for his failure to make this claim earlier, he was prejudiced as a result or he is actually innocent. Thus, there simply is no basis to excuse the procedural default in his case.

1048, 2020 U.S. Dist. LEXIS 245503, at *14 (E.D. Pa. Dec. 30, 2020).  Pleas induced by threats, misrepresentation, or promises that are by their nature improper are not considered voluntary.  *Brady*, 397 U.S. at 755; *Aldea*, 2020 U.S. Dist. LEXIS at *14 - *15.  However, a voluntary and intelligent guilty plea made by an accused who has been advised by competent counsel generally may not be collaterally attacked.  *Mabry v. Johnson*, 467 U.S. 504, 508 (1984).

     Robinson contends his plea was coerced and not voluntary, noting he did not mean to waive his right to represent himself at trial by - "acquiescing with" the Court's denial of his request that a sixth attorney be appointed to represent him.  This contention is belied by the record.  Although there is no question the Court refused Robinson's request for another attorney, it made clear that Robinson could either proceed with existing counsel, represent himself, or be tried in absentia if he refused the other options.  Indeed, the Court repeatedly asked Robinson if he wished to represent himself and informed him he was free to do so.  When Robinson responded he would just plead guilty because that was his "only option" and he was being "forced to plea out," the Court stated it would not take his plea but would proceed to trial. Recognizing that self-representation "won't be in my best interest," Robinson emphatically declined to represent himself.  N.T. 5/6/19, at 2, 11-13.  Eventually, Robinson agreed to permit his existing appointed counsel to speak with him.  Following a 25-minute recess in the pretrial conference, defense counsel advised the Court that Robinson had entered into a provisional plea agreement with the Government. N.T. 5/6/19, at 17-20.  It was agreed Robinson's attorney would adopt the handwritten motions in limine which Robinson had prepared, the Court would rule on them and following the Court's ruling, Robinson would plead guilty and receive a three-point sentence reduction for acceptance of responsibility N.T. 5/6/19, at 19-22. It was further agreed Robinson would have a Change of Plea hearing later that week.  N.T. 5/6/19, at 23-25.  The Court advised Robinson it did not "want to be accused of

forcing anyone to plead guilty" emphasizing that it had the discretion to turn down his guilty plea and was "happy to try" the case. N.T. 5/6/19, at 25. [7]  Robinson confirmed he understood. N.T. 5/6/19, at 27.

A full colloquy on the voluntariness of his guilty plea and on the terms and conditions of the plea agreement was then conducted with Robinson a few days later at his Change of Plea Hearing on May 10, 2019. After inquiring whether Robinson was now satisfied with the representation he received from his court-appointed counsel,[8] the Court spent several minutes

---

[7] The exchange continued:

> THE COURT: So, Mr. Robinson, is that right? You want – and you don't have to admit to anything, but you want to have your lawyer talk to the Government to see if this matter could be resolved before Monday?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: All right, and you understand that you've raised a lot of issues and a lot of those issues are going to be rendered moot, a lot of them, not all of them perhaps, but most of them going to be rendered moot once you plead guilty. You understand that?
>
> THE DEFENDANT: Yes, Your Honor.

N.T. 5/6/19, at 25-26.

[8]   THE COURT: All right. Now did you talk to Attorney Hetznecker about the charges in this case, the evidence that the Government has, and your understanding of how weak or how strong the Government's case against you is?

> THE DEFENDANT: Yes, sir.
>
> THE COURT: Did you also talk about how to or what potential defenses you may have?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT:  Are you satisfied right now with his representation and advice?
>
> THE DEFENDANT: Yes, I am, sir.

N.T. 5/10/19, at 11.

confirming Robinson understood no one could coerce, threaten or force him to plead guilty; he did not have to plead guilty; and he could promptly proceed to trial if he so desired. N.T. 5/10/19, at 12-13. The following exchange then took place:

> THE COURT:  All right, do you feel that I pressured you in any way, shape or form to give up your right to represent yourself or force you in any way to feel -- to plead guilty to these charges?
>
> THE DEFENDANT:  No, sir.
>
> THE COURT:  All right, whose idea is it to plead guilty?
>
> THE DEFENDANT:  Mine.
>
> THE COURT:  And why are you pleading guilty?
>
> THE DEFENDANT:  Because I'm guilty, sir.
>
> THE COURT:  Okay, are you satisfied with the advice and representation that Attorney Hetznecker has given you?
>
> THE DEFENDANT:  Yes, I am.

N.T. 5/10/19, at 14.

The record here is therefore clear: no one, including the Court, coerced, threatened or forced Robinson to enter a plea of guilty to the bank robbery charges at issue in this case. He is not entitled to habeas relief on this claim.

Robinson next raises vague "ineffective assistance of counsel issues" regarding two of his court-appointed attorneys, Stuart Patchen and Paul Hetznecker. Robinson claims Attorney Patchen, failed to properly utilize two Philadelphia Police Department Reports which he contends would have contradicted the testimony of the police officers who were at the scene of his arrest and would have shown that he was unlawfully arrested. He faults Attorney Hetznecker for submitting a *Brady* motion on his behalf with the name of a different client on it.

Claims of ineffective assistance of counsel are evaluated under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the Court articulated a two-part test to assess whether a defendant has been denied his Sixth Amendment right to the effective assistance of counsel. *Id.* "A petitioner, first, must establish that counsel's performance was deficient," *i.e.,* that it fell "below an objective standard of reasonableness." *Simon v. Gov't of Virgin Islands*, 929 F.3d 118, 128 (3d Cir. 2019)(quoting *Strickland*, 466 U.S. at 687); *Gov't of Virgin Islands v. Vanterpool*, 767 F.3d 157, 165 (3d Cir. 2014). The first prong "is necessarily linked to the practice and expectations of the legal community: [t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel," and thus "courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Rose v. Flores-Ortega*, 528 U.S. 470, 477 (2000). In undertaking this review, "judicial scrutiny of counsel's performance must be highly deferential." *Id*.

"Second, the petitioner must establish prejudice: a showing that 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Simon, supra*. In considering this prong, courts must "ask whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Padilla, supra.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 944 (3d Cir. 2019). This requires a substantial, not just a conceivable likelihood of a different result. *Shinn v. Kayer,* ___U.S.___, 141 S. Ct. 517, 523 (2020); *Cullen v. Pinholster,* 563 U.S. 170, 189 (2011). The two *Strickland* prongs may be considered in either order; it is "often practical to consider the prejudice

11

prong first," as it may be preferable to avoid passing judgment on counsel's performance when possible." *United States v. Washington*, 869 F.3d 193, 206 (3d Cir. 2017)(quoting *Vanterpool*, 767 F.3d at 165)).

As with his first claim, Robinson's ineffective assistance of counsel claims are also belied by the record. The transcript from the suppression hearing before Judge Stengel on April 24, 2017 evinces that Attorney Patchen did, in fact, extensively cross-examine the arresting officers on the disparities between their in-court testimony and what was contained in the Philadelphia Police Department reports as well as on the facts and circumstances surrounding the identification of Robinson as the perpetrator of the robberies and his ultimate arrest. N.T. 4/24/17, at 22-25, 28, 47, 108-117, 121-129. Attorney Patchen also orally argued Robinson's identification was unduly suggestive and filed legal memoranda seeking suppression of Robinson's clothing and cane on the ground that he was unlawfully arrested and was not merely the subject of a "Terry stop." ECF Nos. 24, 25. Thus, Robinson has failed to show error on the part of Attorney Patchen and has made no showing of discernable prejudice as a result.

The Court reaches the same conclusion as to Attorney Hetznecker's representation. Robinson accuses Hetznecker of constitutionally ineffective assistance as a result of a typographical error in his motion for discovery of exculpatory evidence. In reviewing the motion for *Brady* Disclosure that Attorney Hetznecker filed on Robinson's behalf on April 26, 2019 (ECF No. 79) the Court can find no typographical errors misnaming the defendant or otherwise. Even accepting Robinson's assertion as true, he has made no showing that the error prejudiced him. The Government has an affirmative obligation to provide any and all exculpatory information in its possession to the defense, regardless of whether a motion has been filed to obtain it or not. *See, Brady v. Maryland*, 373 U.S. 83 (1963). Robinson does not argue and has not shown that the

12

Government had or failed to produce any exculpatory evidence or that he was in any way prejudiced by the alleged typographical miscue. There being no basis for a finding that either of his attorneys was constitutionally ineffective or that a *Brady* violation occurred, Robinson's request for habeas relief on this ground is denied.

Robinson next raises the so-called "stalking horse doctrine" as another ground for relief under § 2255. He alleges:

> No criminal complaint nor Affidavit of Probable Cause was ever filed in this case. To further their investigation – The FBI used my violation of supervised Release warrant as a "Pawn" to assist them in the Bank Robbery charges. A clear violation of the Constitution and Federal Rules of Criminal Procedure, as well as oaths of offices under the Constitution the FBI Agent and AUSA take and are suppose to uphold!

Def.'s § 2255 Motion, ECF No. 143, at 9.

The "stalking horse" theory has been described as follows:

> A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer.

*United States v. Williams*, 417 F.3d 373, 377 (3d Cir. 2005)(quoting *United States v. Watts*, 67 F.3d 790, 794 (9th Cir. 1995), *rev'd on other grounds*, 519 U.S. 148, 117 S. Ct. 633 (1995)). However, as the Third Circuit recognized in *Williams*, "stalking horse" claims are no longer viable following the Supreme Court's decision in *United States v. Knights*, 534 U.S. 112 (2001).[9] Thus,

---

[9] Recognizing "that probationers 'do not enjoy' the absolute liberty to which every private citizen is entitled," and probation conditions often "significantly diminish[]… the reasonable expectation of privacy," the Court in *Knights* held that "a lesser than probable cause standard" is warranted and "no more than a reasonable suspicion …[is] required to conduct a search…" *Knights,* 534 U.S. at 121.

13

"instead of inquiring as to [the] purpose" of a search, the Court need only determine "whether the search was reasonable under Fourth Amendment principles." "[R]easonableness in this context," *i.e.,* the search of a probationer or parolee, "requires no more than reasonable suspicion." *Williams*, 417 F.3d at 378. Reasonable suspicion is properly evaluated by looking at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Cortez*, 449 U.S. 411, 417-418 (1981).

In addition to being foreclosed by *Williams*, Robinson's "stalking horse" argument is puzzling given that neither he nor any property were ever searched. Rather, the record reflects that Robinson was stopped by a SEPTA police officer who recognized him from photos and "Be On The Lookout" bulletins circulated after two recent robberies and subjected to a pat down for weapons only. No weapons were found or confiscated and Robinson was briefly detained in the back of a police vehicle while two witnesses to the preceding day's robbery were transported to the scene to verify whether Robinson was or was not the perpetrator. While his probation officer also recognized Robinson from the circulated photographs and that recognition served as the grounds for the issuance of a warrant for his arrest for violation of the terms of his supervised release, that warrant was not the reason for his initial stop or subsequent arrest.[10] To the extent that these actions constitute "collaboration" between the U.S. Probation Office and the police, such

---

[10] As noted in the Third Circuit's decision affirming denial of Robinson's motion to suppress, the U.S. Probation Office secured the warrant for Robinson's arrest on March 21, 2016, the day before the stop. *Robinson,* 821 F. App'x. at 142-143. Although the responding police officers ran a warrant search on Robinson, they could not recall whether they became aware at that time that there were outstanding warrants for his arrest. *Id.,* at 143. He was only put under arrest after the two witnesses identified him. *Id.,* at 145.

collaboration would not be unlawful even under the discredited stalking horse doctrine. Robinson is entitled to no relief on the basis of this argument either.

For his fourth and fifth claims, Robinson challenges the propriety of his having been charged with bank robbery at all and having been sentenced as a career offender. In pleading guilty, Robinson voluntarily waived most of his appellate rights, including his right to appeal the propriety of the charges against him. The Court clearly and specifically informed Robinson that "as part of your knowing and voluntary waiver of your right to appeal or to attack your conviction, you are giving up directly forever your right to appeal or to attack your conviction on the following two grounds: [t]hat the statute you pled guilty to is unconstitutional and your conduct falls within the statute. Do you understand?" In response, Robinson answered "Yes, sir." N.T. 5/10/19, at 23-24.

Generally speaking, waivers of appeals are to be strictly construed; if entered into knowingly and voluntarily, they are valid. *United States v. Khattak*, 273 F.3d 557, 562 (3d Cir. 2001). Consequently, appellate waivers will be upheld when: "(1) the issues the defendant is endeavoring to pursue fall within the scope of his appellate waiver, and (2) he knowingly and voluntarily agreed to the appellate waiver, unless (3) enforcing the appellate waiver will result in a miscarriage of justice." *United States v. Icker*, No. 20-2632, 2021 U.S. App. LEXIS 27538, at *7 (3d Cir. Sept. 14, 2021) (quoting *United States v. Wilson*, 707 F.3d 412, 414 (3d Cir. 2013)). Robinson's argument that he was improperly charged because the notes he passed to the victims simply demanded money but were otherwise "non-threatening," clearly falls within the scope of the appellate waiver and is barred.

Moreover, this claim also fails on the merits. Robinson was charged with and pled guilty to two charges of unarmed bank robbery by intimidation in violation of 18 U.S.C. § 2113(a). In

*United States v. Wilson*, 880 F.3d 80, 88 (3d Cir. 2018), *cert. denied,* 138 S. Ct. 2506 (2018), the Third Circuit joined the 1st, 4th, 5th, 6th, 7th, 8th and 11th Circuits in holding that bank robbery by intimidation categorically qualifies as a crime of violence under U.S.S.G. § 4B1.2(a)'s "elements clause." And, "since bank robbery by intimidation is indeed a crime of violence," a District Court is "correct to apply the career offender enhancement." *Id.* As *Wilson* makes clear, Robinson's actions by definition were threatening irrespective of whether a weapon[11] or other overt behavior was involved. His claim for habeas relief on this ground is also properly denied.[12]

Finally, Robinson now seeks to collaterally attack the calculation of the sentence he received, even after it was clearly explained that by pleading guilty he was limiting his ability to challenge his sentence solely to the issue whether it exceeded the statutory maximum for each count or the sentencing judge imposed an "upward departure" from the Sentencing Guidelines or an "upward variance" above the final sentencing guideline range determined by the court.[13] Here, the only issue Robinson raised on appeal was whether the District Court erred in denying his motion to suppress.

In addition to being waived and procedurally defaulted, this claim likewise fails on its face. Robinson contends his 1994 state court conviction for possession of cocaine with intent to deliver is no longer a valid predicate for a career offender designation in light of the "new laws for

---

[11] The Court again notes that in both robberies, Robinson was carrying a black walking cane.

[12] *Wilson* further noted that "[w]hether the theft of money from a bank involved intimidation is determined under an objective standard and from the victim's perspective." *Wilson*, 880 F.3d at 85. As the Court learned at sentencing, one of Robinson's victim tellers who was the breadwinner for her family, was so frightened by the robbery that she quit a job that she loved because she no longer felt safe working at the bank. N.T. 8/28/19, at 29-33.

[13] Under the terms of Robinson's plea agreement, he only had greater appellate options if the Government appealed the sentence. N.T. 5/10/19, at 24. The Government did not take an appeal from the sentence imposed.

sentences for crack cocaine under the First Step Act." But the "new laws" on which Robinson relies are only retroactively applicable to "a violation of a Federal criminal statute, the statutory penalties for which were modified by Section 2 or 3 of the Fair Sentencing Act of 2010, that was committed before August 3, 2010." *United States v. Easter*, 975 F.3d 318, 321, n. 2 (3d Cir. 2020)(quoting Pub. L. 115-391, §404; 132 Stat. 5194, 5222 (2018)). Inasmuch as Robinson's possession with intent to deliver conviction was for a violation of a Pennsylvania state statute, the amendments to the federal Fair Sentencing Act enacted as part of the First Step Act have no application to his 1994 conviction.

**CONCLUSION**

Robinson's § 2255 motion is therefore denied in its entirety for all of the reasons outlined above. Further, the Court cannot find that Robinson has made the requisite substantial showing of the denial of a constitutional right nor has he demonstrated that jurists of reason would find this or the correctness of the Court's procedural findings to be debatable. There is thus no basis upon which to issue a Certificate of Appealability. *See generally*, 28 U.S.C. § 2253; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

An appropriate Order follows.